# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

—————————————

No. 10-4490

—————————————

UNITED  STATES  OF  AMERICA,

*Appellee,*

v.

PHILLIP WINDOM OFFILL, JR.,

*Defendant - Appellant.*

—————————————

Appeal from the United States District Court
for the Eastern District of Virginia
at Alexandria

*The Honorable Liam O'Grady, District Judge*

—————————————

BRIEF  OF  THE  UNITED  STATES

—————————————

Neil H. MacBride
United States Attorney

David B. Goodhand
Assistant United States Attorney
Justin W. Williams U.S. Attorney's Bldg.
2100 Jamieson Avenue
Alexandria, Virginia 22314
703-299-3700

Lanny A. Breuer
Assistant Attorney General

Patrick F. Stokes
Attorney
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue, NW, 4th Floor
Washington, DC 20005
(202) 305-4232

*Attorneys for the United States of America*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Securities Registration Evasion. . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    Artificial Inflation of Stock Prices and Dumping the Stock. . . . . . . 8

    C.    Expert Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    D.    Evidence from 2006/2007.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.    THE DISTRICT COURT DID NOT ERR BY ADMITTING
EXPERT AND LAY TESTIMONY ABOUT ARCANE
EXEMPTIONS TO SECURITIES REGISTRATION
REQUIREMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.    Expert Testimony Procedural Background. . . . . . . . . . . . . . . . . . . 15

    B.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    C.    Analysis of the Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        I.    The District Court Did Not Err by Admitting
Expert Testimony Related to Complex Securities
Registration Violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

i

    ii.  The District Court Did Not Plainly Err By Admitting
        Lay Opinion Testimony of David Stocker and
        Mark Lindberg. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

II.  THE DISTRICT COURT DID NOT ABUSE ITS
   DISCRETION BY ADMITTING EVIDENCE FROM
   LATE 2006 AND EARLY 2007 TO PROVE OFFILL'S
   KNOWLEDGE AND INTENT OF THE CHARGED
   TRANSACTIONS FROM 2004. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

   A.  Procedural Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

   B.  Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

   C.  Analysis of the Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

III.  THE DISTRICT COURT DID NOT ABUSE ITS
   DISCRETION BY DENYING OFFILL'S REQUEST
   FOR A MULTIPLE CONSPIRACIES JURY INSTRUCTION
   WHERE THE EVIDENCE ESTABLISHED A SINGLE
   CONSPIRACY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

   A.  Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

   B.  Analysis of the Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

IV.  THE SENTENCE IMPOSED BY THE DISTRICT COURT
   WAS REASONABLE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

   A.  Procedural Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

   B.  Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

   C.  Analysis of the Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

     I.  The District Court Did Not Clearly Err by Including
        David Stocker's Gain When Determining Offill's
        Offense Level. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

ii.     The District Court Did Not Clearly Err by Denying
        Offill's Request for a Role Reduction . . . . . . . . . . . . . . . . . . 60

iii.    Offill's Sentence Is Not Disproportionate. . . . . . . . . . . . . . . 61

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

STATEMENT WITH RESPECT TO ORAL ARGUMENT. . . . . . . . . . . . . . . 64

CERTIFICATE OF COMPLIANCE WITH RULE 32(a). . . . . . . . . . . . . . . . . 65

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

# TABLE OF AUTHORITIES

**FEDERAL CASES**          **Page**

*Adalman v. Baker, Watts & Co.*, 807 F.2d 359 (4th Cir. 1986) . . . . . . . . . . . 20, 22

*Kotteakos v. United States*, 328 U.S. 750 (1946) . . . . . . . . . . . . . . . . . . . . . . 53-54

*Mattison v. Dallas Carrier Corp.,* 947 F.2d 95 (4th Cir. 1991). . . . . . . . . . . . 34-35

*MCI Tele-communications Corp. v. Wanzer*, 897 F.2d 703 (4th Cir. 1990) . . 34, 38

*Peckham v. Continental Casualty Ins. Co.*, 895 F.2d 830 (1st Cir. 1990) . . . . . 21

*Torres v. County of Oakland*, 758 F.2d 147 (6th Cir. 1985). . . . . 20, 22, 26, 38-39

*United States v. Akinkoye*, 185 F.3d 192 (4th Cir. 1999). . . . . . . . . . . . . . . . 60-61

*United States v. Aramony*, 88 F.3d 1369 (4th Cir. 1996) . . . . . . . . . . . . 43-45, 49

*United States v. Barile*, 286 F.3d 749 (4th Cir. 2002). . . . . . . . . . . . . . . 20-21, 26

*United States v. Blake*, 571 F.3d 331 (4th Cir. 2009)

    *cert. denied*, 130 S. Ct. 1104 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*United States v. Bolden*, 325 F.3d 471 (4th Cir. 2003). . . . . . . . . . . . . . . . . . . 55

*United States v. Bollin*, 264 F.3d 391 (4th Cir. 2001). . . . . . . . . . . . . . . . . . . . 55

*United States v. Booker*, 543 U.S. 220 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Boscarino*, 437 F.3d 634 (7th Cir. 2006). . . . . . . . . . . . . . . . . 62

*United States v. Brooks*, 928 F.2d 1403 (4th Cir. 1991). . . . . . . . . . . . . . . . . . . 50

*United States v. Castaneda-Cantu*, 20 F.3d 1325 (5th Cir. 1994). . . . . . . . . . . . 51

*United States v. Chin*, 83 F.3d 83 (4th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Cohen*, 518 F.2d 727 (4th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Curry*, 536 F.3d 571 (6th Cir. 2008*)*. . . . . . . . . . . . . . . . . . . . . . 61

*United States v. Dennis*, 917 F.2d 1031 (7th Cir. 1990). . . . . . . . . . . . . . . . . . . . 53

*United States v. Diaz-Ibarra*, 522 F.3d 343 (4th Cir. 2008). . . . . . . . . . . . . . . . 57

*United States v. DiZenzo*, 500 F.2d 263 (4th Cir. 1974) . . . . . . . . . . . . . . . . . . . . 47

*United States v. Espino*, 32 F.3d 253 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . 38-39

*United States v. Fowler*, 932 F.2d 306 (4th Cir. 1991). . . . . . . . . . . . . . 33-34, 38

*United States v. Gilliam*, 994 F.2d 97 (2d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Griffin*, 324 F.3d 330 (5th Cir. 2003). . . . . . . . . . . . . . . . . . . . . 38

*United States v. Hadaway*, 681 F.2d 214 (4th Cir. 1982). . . . . . . . . . . . . . . . . . . 46

*United States v. Hadeed*, 2010 WL 1734972 (4th Cir. 2010) (unpub.) . . . . . . . . . 53

*United States v. Heater*, 63 F.3d 311 (4th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Hopkins*, 310 F.3d 145 (4th Cir. 2002). . . . . . . . . . . . . . . . . . . . 17

*United States v. Jeffers*, 570 F.3d 557 (4th Cir. 2009) . . . . . . . . . . . . . . . . . 52-53

*United States v. Johnson*, 54 F.3d 1150 (4th Cir. 1995). . . . . . . . . . . . . . . . . . . . 52

*United States v. Johnson*, 445 F.3d 339 (4th Cir. 2006). . . . . . . . . . . . . . . . . . . . 61

*United States v. Kennedy*, 32 F.3d 876 (4th Cir. 1994). . . . . . . . . . . . . . . . . . 51-52

*United States v. Leavis*, 853 F.2d 215 (4th Cir. 1988). . . . . . . . . . . . . . . . . . 52-53

*United States v. Loayza*, 107 F.3d 257 (4th Cir. 1997). . . . . . . . . . . . . . . . . . . . . 57

*United States v. McMillan*, 600 F.3d 434 (11th Cir. 2010). . . . . . . . . . . . . . . . . 58

*United States v. Mohr*, 318 F.3d 613 (4th Cir. 2003). . . . . . . . . . . . . . . . . 21, 27, 47

*United States v. Olano*, 507 U.S. 725 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Patterson*, 150 F.3d 382 (4th Cir. 1998). . . . . . . . . . . . . . . . . . 50

*United States v. Perkins*, 470 F.3d 150 (4th Cir. 2006). . . . . . . . . . . . . . 17, 19-20

*United States v. Powers*, 59 F.3d 1460 (4th Cir. 1995). . . . . . . . . . . . . . . . . 43, 45

*United States v. Queen*, 132 F.3d 991 (4th Cir. 1997). . . . . . . . . . . . . 44-45, 47-48

*United States v. Quinn*, 359 F.3d 666 (4th Cir. 2004). . . . . . . . . . . . . . . . . . . 62

*United States v. Rea*, 958 F.2d 1206 (2d Cir. 1992). . . . . . . . . . . . . . . . . . . . . 34

*United States v. Reavis*, 48 F.3d 763 (4th Cir. 1995). . . . . . . . . . . . . . . . . . . . 57

*United States v. Reinhardt*, 347 F.Supp.2d 222 (D. Md. 2004). . . . . . . . . . . . . 48

*United States v. Riddle*, 103 F.3d 423 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . 34

*United States v. Roberts*, 262 F.3d 286 (4th Cir.2001). . . . . . . . . . . . . . . . . . . 52

*United States v. Scop*, 846 F.2d 135 (2d Cir. 1988) . . . . . . . . . . . . . . . . 20, 22, 26

*United States v. Squillacote*, 221 F.3d 542 (4th Cir. 2000). . . . . . . . . . . . . . . . 51

*United States v. Stockton*, 349 F.3d 755 (4th Cir. 2003). . . . . . . . . . . . . . . . . . 51

*United States v. Thornton*, 554 F.3d 443 (4th Cir. 2009). . . . . . . . . . . . . . . . . . 57

*United States v. Van Metre*, 150 F. 3d 339 (4th Cir. 1998) . . . . . . . . . . . . . 43, 45

*United States v. Whaley*, 786 F.2d 1229 (4th Cir. 1986). . . . . . . . . . . . . . . . . . 46

*United States v. Williams*, 81 F.3d 1321 (4th Cir. 1996). . . . . . . . . . . . . . . . . . 18

*United States v. Woodard*, 459 F.3d 1078 (11th Cir. 2006). . . . . . . . . . . . . . . . 55

*Wilson v. Williams,* 182 F.3d 562 (7th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . 18

**FEDERAL STATUTES**

15 U.S.C. § 77b(2)(11). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

15 U.S.C. §§ 77(d)(1), 77e and 77x. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 37

18 U.S.C. § 371. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

**STATE STATUTES**

Rule 504 of Regulation D of the Securities Act of 1933 . . . . . . . . . . . . . . . . *passim*

Texas Administrative Code (TAC) § 139.13 . . . . . . . . . . . . . . . . . . . . . 10, 25, 27

Texas Administrative Code (TAC) § 139.14 . . . . . . . . . . . . . . . . . . . 10, 25, 27, 29

Texas Administrative Code (TAC) § 139.16 . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Texas Administrative Code (TAC) § 139.19 . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**FEDERAL RULES AND REGULATIONS**

17 C.F.R. § 230.144.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 25, 27

17 C.F.R. § 230.504.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Fed. R. App. P. 32(a)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Fed. R. App. P. 32(a)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Fed. R. App. P. 32(a)(7)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Fed. R. App. P. 32(a)(7)(B)(iii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Fed. R. Evid. 401. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Fed. R. Evid. 403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Fed. R. Evid. 404(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Evid. 701. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-34

Fed. R. Evid. 702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 33

Fed. R. Evid. 702.03[1]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. R. Evid. 704.04[2][a]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Fed. R. Evid. 704.04[2][b]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 26

Fed. R. Evid. 704(a) and (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 33

**SENTENCING GUIDELINES**

U.S.S.G. § 1B1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

U.S.S.G. § 2B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

U.S.S.G. § 3B1.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 10-4490
_____

UNITED  STATES  OF  AMERICA,

*Appellee,*

v.

PHILLIP WINDOM OFFILL, JR.,

*Appellant.*

_____

Appeal from the United States District Court
for the Eastern District of Virginia
at Alexandria

_____

BRIEF  OF  THE  UNITED  STATES
_____

## STATEMENT OF THE ISSUES

1.      Whether the district court committed reversible error by permitting the government's two expert witnesses and two of its lay witnesses to describe general securities law concepts and to explain securities terms that were part of the evidence in the case.

2.      Whether the district court abused its discretion by admitting evidence from late 2006 and early 2007 as intrinsic and pursuant to Rule 404(b) when it

related to Offill's knowledge of spamming in 2004 and his knowledge and intent in connection with a nearly identical market manipulation scheme.

3.      Whether the district court abused its discretion when it denied Offill's request for a multiple conspiracies jury instruction where the evidence showed a single conspiracy and did not show that Offill was only involved in separate conspiracies unrelated to the overall charged conspiracy.

4.      Whether the district court's sentence was reasonable when it varied 72 months below the guidelines range and rejected Offill's gain calculation and request for a role reduction.

## STATEMENT OF THE CASE

On March 12, 2009, a federal grand jury in the Eastern District of Virginia, Alexandria Division, charged the defendant, Phillip Windom Offill, Jr., with one count of conspiracy to commit securities registration violations, securities fraud, and wire fraud, in violation of Title 18, United States Code, Section 371, and nine counts of wire fraud, in violation of Title 18, United States Code, Section 1343. J.A. 20.  The case against the defendant was tried to a jury beginning on January 13, 2010.  J.A. 245.  On January 28, 2010, the jury convicted the defendant of all counts.  J.A. 2358-59.  On April 23, 2010, the district court (the Honorable Liam O'Grady) sentenced the defendant to 60 months' incarceration on the conspiracy

charge and 96 months' incarceration on each wire fraud court, with the sentences to run concurrently.  J.A. 2557-58.

## STATEMENT OF FACTS

From approximately March 2004 through October 2004, Phillip Offill participated in a conspiracy to evade securities registration requirements and manipulate stock prices in connection with a series of "pump-and-dump" transactions.  J.A. 26.  Offill previously had been an enforcement attorney with the U.S. Securities and Exchange Commission (SEC) for fifteen years and by 2004 was the head of the securities practice in a law firm in Dallas, Texas.  J.A. 405, 426, 1822-23.

Offill's role in the scheme was multifaceted.  He devised sham transactions, created materially false documents to support the transactions, and pretended to be an "accredited investor"[1] in order to give the appearance of complying with federal and Texas securities registration exemptions.  He then assisted in the distribution of unregistered stock to co-conspirators so they could artificially manipulate the price and sell it to the general investing public.

---

[1] As defined by the court, this term essentially signifies a wealthy investor. J.A. 2328.

The conspiracy count in the indictment identified illegal issuances for nine companies (the Issuers): Emerging Holdings, MassClick, China Score, Ecogate, Media International Concepts, Vanquish Productions, Auction Mills, AVL Global, and Custom Designed Compressor Systems. J.A. 22-23. The conspiracy count also alleged that Offill and others conspired to artificially manipulate the stock prices of three of the Issuers in pump and dumps, including Emerging Holdings, MassClick, and China Score. J.A. 28-30. Offill was also charged in nine substantive wire fraud counts in connection with his role in the Emerging Holdings pump and dump. J.A. 31-32.

A.    Securities Registration Evasion

Offill played an instrumental role in the first step of the scheme—obtaining "free-trading" stock, that is, stock without any trading restrictions, that could be sold to the general investing public. In March 2004, David Stocker, a securities attorney, retained Offill to advise him on the issuance of free-trading stock by the Issuers (and approximately forty-two other companies not charged in the indictment) without filing a registration statement. J.A. 427-29. Registering securities with the SEC was expensive and time-consuming, many of the "penny stock" companies with which Stocker worked had no actual operations, customers, or revenue, and thus registration was not a practical option. J.A. 432.

Offill advised Stocker how to use Rule 504 of Regulation D of the

Securities Act of 1933 (Rule 504)[2] and its Texas state-law counterpart, Texas

Administrative Code (TAC) § 139.19, as exemptions from federal and Texas

registration requirements.  J.A. 428-31.  As the district court instructed the jury,

Rule 504 and TAC § 139.19 did *not* create free trading stock; rather, in

conjunction, they provided an exemption from registration for a limited issuance

of *restricted* stock to accredited investors for raising up to $1 million.  J.A. 347,

2327-29.  Under the combination of Rule 504 and TAC § 139.19, an accredited

investor initially purchasing stock from an Issuer had to purchase it with

"investment intent," which was manifested by holding the stock for a period of at

least one year with certain exceptions.  J.A. 2328-29.  If a company and investor

followed these rules, the company did not need to file a registration statement.

J.A. 2327.

As Stocker testified, Offill advised him how to set up sham transactions

with accredited investor entities to give the false appearance that the entities were

purchasing the stock with the requisite "investment intent" in order to glean the

benefit of the registration exemption.  J.A. 428-31, 433-34, 436, 2743-45; Govt.

Exh. 16.  In reality, Offill and Stocker set up the transactions so that the shares

---

[2] *See* 17 C.F.R. § 230.504.

would be immediately transferred to other co-conspirators for sale to the general investing public via the Pink Sheets, an Internet-based stock price quotation system. J.A. 344-45, 502. As such, these were public distributions and required the filing of registration statements. J.A. 447, 489-90, 2329. However, no registration statements were ever filed. J.A. 518-19. Offill and Stocker covered up the true nature of these transactions with legal opinion letters and stock subscription agreements that contained numerous false representations, including that the transactions complied with Rule 504 and TAC § 139.19; Offill had paid for the stock; he did so for investment purposes; he had no present intention of selling the stock; and that the transactions were not part of a "scheme or plan to evade registration requirements." J.A. 435-41, 488-89.[3] At Offill's direction, Stocker also included in his opinion letters that he was not opining on the "underwriter" status of those participating in the transactions. J.A. 445-47.[4]

---

[3] The legal opinion letters and subscription agreements were substantively similarly for each transaction, and thus the parties have only included one example of each in the Joint Appendix. J.A. 2589-2595, 2596-2599.

[4] As the court instructed, an underwriter is essentially a person who takes stock with a view toward distributing it publicly. J.A. 2330; *see* 15 U.S.C. § 77b(2)(11). The effect of being deemed an underwriter is that a registration statement must be filed. J.A. 447; *see* 15 U.S.C. §§ 77(d)(1) and 77e.

Offill also directly participated in these sham transactions. He set up and controlled shell companies that acted as the initial accredited investors in the stock issuances by the Issuers. J.A. 451-52. Despite various representations in the subscription agreements that he was purchasing the stock for investment purposes, Offill contemporaneously completed paperwork to permit Stocker to immediately transfer Offill's stock to other entities and co-conspirators. J.A. 480-87. As Stocker testified, Offill and he devised the sham transactions to give the false appearance of having complied with the law so they could get free-trading stock into the hands of co-conspirators for quick sale to the general investing public. J.A. 432, 440, 487, 489-90, 496-97, 539, 542, 604, 606.

Offill engaged in fifty-one Rule 504 stock transactions with Stocker in approximately five-and-a-half months. J.A. 767-68, 2752-58; Govt. Exh. 30. In total, Offill signed subscription agreements to purchase approximately 234 million shares at a price of approximately $2.5 million. *Id.* In each instance, Offill represented in the subscription agreements that he intended to hold the stock for investment purposes. J.A. 437-39, 459-61. In fact, Offill never paid any money for the shares; never held the stock as an investment; and caused the shares to be transferred to co-conspirators generally within days of the shares being issued to an entity Offill controlled. J.A. 457-62. For playing the role of an investor,

7

Stocker paid Offill $2,500 per transaction, which amounted to $127,500 in total. J.A. 462-63.

B.    Artificial Inflation of Stock Prices and Dumping the Stock

After Offill and Stocker caused the illegal distribution of the "free-trading" stock that was in fact restricted, co-conspirators engaged in fraudulent marketing campaigns to "pump up" the value of the stock. They did this through spam email, press releases, and fax blasts that contained false information. *See, e.g.,* J.A. 687, 799, 816-17, 889, 896-98. In particular, with Emerging Holdings, MassClick, and China Score, Greg Neu and Steve Luscko, the two stock promoters who organized the marketing campaigns, hired Justin Medlin, a.k.a. The Kid, to conduct spam email campaigns containing false information about the companies. J.A. 896-98, 919-21, 929-31.

The co-conspirators also manipulated the price of the stock by controlling the "float," that is, the outstanding stock available for sale, and coordinating the timing of their trading activities. J.A. 483-84. By holding the stock and selling at an appointed time, the co-conspirators, including Offill, were able to control the supply of stock sold to the investing public after the fraudulent promotions, thereby increasing the price. *Id.*

After the "pump" phase, the co-conspirators "dumped" their artificially inflated stock through sales to the general investing public. Co-conspirators earned millions from the sale of their stock. *See, e.g.,* J.A. 1630-33. Offill received shares of Emerging Holdings and MassClick stock through ACAP Partners II, an entity beneficially owned by co-conspirator Mark Lindberg. J.A. 502, 507-08, 551-52, 765, 801-11. Offill opened a brokerage account in his name for ACAP Partners II, and directed the sale of $89,657 of Emerging Holdings stock and $97,332 of MassClick stock. J.A. 806, 809, 1650-51. Offill then laundered the proceeds of these stock sales through his law firm's trust account. J.A. 804-07. He distributed some of the proceeds to Lindberg and kept some for himself. J.A. 801-11, 1650-51.

C.    Expert Testimony

The government introduced testimony through two experts, Professor Steve Thel of Fordham University and Commissioner Denise Crawford of the Texas State Securities Board. Professor Thel, an expert on the federal securities laws, testified about general securities law concepts, such as the meaning of the terms stock, bond, security, registration statement, underwriter, dealer, accredited investor, private placement, and registration exemption. J.A. 323-24, 329, 331-32, 334, 337-38, 372-74. Commissioner Crawford focused on Texas securities

practice, including the issuance of unregistered stock pursuant to registration exemptions. J.A. 375-81. They also explained certain core concepts, such as the purpose of a registration statement, information it contained, how companies could issue stock in private placements, and how companies could use Rule 504 and TAC § 139.19 to raise money through the issuance of restricted stock. J.A. 325-26, 329-30, 373-81.

Offill elicited testimony from the experts about alternative registration exemptions not raised by the government, including 17 C.F.R. § 230.144 (Rule 144), a safe harbor for persons not deemed to be underwriters; TAC § 139.13, which provides a Texas companion exemption from registration to Rule 144; and TAC § 139.14, which provides an exemption where stock sales are not directly or indirectly for the benefit of the issuer. J.A. 381, 384-86.

Following Offill's testimony, in rebuttal, Professor Thel and Commissioner Crawford addressed the issues raised by Offill, including the applicability of Rule 144 and TAC § 139.19 to Rule 504 offerings, as well as distributions and sales of stock by second-tier accredited investors who received stock from initial accredited investors. J.A. 2141-43, 2174, 2180. Commissioner Crawford also testified that, contrary to what Offill claimed in his testimony, she never had taken

the position that Rule 504 and TAC § 139.19 created free-trading stock.  J.A.

1845-46, 2174.

D.    Evidence from 2006/2007

Pretrial the government moved *in limine* to admit evidence of undercover

operations targeting Offill.  Steve Luscko, a promoter on the Emerging Holdings,

MassClick, and China Score transactions who pleaded guilty and cooperated, had

recorded contacts with Offill and another promoter, Ken Owen.  After Owen

agreed to cooperate with the government's investigation, he also recorded contacts

with Offill.

In late 2006 and early 2007, approximately two-and-one-half years after last

working with Offill in connection with the charged conspiracy, Luscko reached

out to Offill at the government's direction.  J.A. 1403-07, 1412-13, 1430, 1446,

1450-52.  He recorded telephone calls with Offill in which they discussed

reconstituting the Emerging Holdings, MassClick, and China Score shell

companies to do new "deals."  J.A. 1412-19.  They also discussed an ongoing

pump-and-dump scheme, Clearvision International (Clearvision), with which

Offill and Owen were involved.  J.A. 1423-25, 1431.

In two recorded conversations, Offill acknowledged his awareness of

Luscko's work with Greg Neu, another promoter for Emerging Holdings,

11

MassClick, and China Score, and Justin Medlin, a.k.a. The Kid, a spammer who had sent out millions of email in connection with these three pump and dumps. J.A. 1418-22. On a December 14, 2006, call, Offill warned Luscko that, although Luscko and Neu had been known for "emailing activities" in 2004, the "market space" had changed dramatically with the advent of "email server farms in China and Russia and Estonia" and the dangers of the "alphabet fellas," that is, law enforcement like the FBI, asking questions. J.A. 1413, 1418-22, 2624.[5] During a January 9, 2007, call, Offill went further, after Luscko had retained him, and asked, despite the dangers Offill had previously identified, if Luscko was "gettin' back to the email business" and if Luscko had "access to some of the old email groups that Greg [Neu]" had used. J.A. 2650-51. They discussed in detail Medlin's current spamming activity, his work with a "hacker," and his servers being located outside of the country. J.A. 2651-53.

---

[5] The government admitted portions of eight recordings at trial: Govt. Exh. 11-1R, 11-1T, J.A. 1447; Govt. Exh. 11-2R, 11-2T, J.A. 1447; Govt. Exh. 11-4R, 11-4T, J.A. 1599; Govt Exh. 11-5R, 11-5T, J.A. 1450; Govt. Exh. 11-6R, 11-6T, J.A. 1451; Govt. Exh. 11-7R, 11-7T, J.A. 1604; Govt. Exh. 11-8R, 11-8T, J.A. 1452-53; Govt. Exh. 11-9R, 11-9T, J.A. 1458. Because the parties inadvertently submitted drafts of the recording transcripts in the Joint Appendix, the parties plan to file a motion for leave to file a supplemental joint appendix containing the final transcripts of the recordings used at trial.

In subsequent calls, both Luscko and Owen separately recorded conversations with Offill regarding Clearvision. As Offill had done with the Issuers, he assisted Clearvision in the issuance of free-trading stock and the transfer of shares to co-conspirators. J.A. 1554-55. Offill and others also retained Owen to build a market for Clearvision stock. J.A. 1553-55. Offill and others arranged for Owen to receive two million shares of Clearvision common stock as payment for marketing activities (a mailing, fax blast, and spam email campaign), "bid support" (buying up shares from non-co-conspirators in the market to limit the available stock in the market and thus reduce downward selling pressure), and "walking" the price of the stock up. J.A. 1545-50, 1553, 1562-63, 1568-69. In calls made in January 2007, Luscko and Owen separately discussed with Offill the timing, cost, and benefits of a spamming campaign with Medlin. J.A. 1447, 1450-51, 1455, 1599, 1605; Govt. Exh. 11-4T, 11-5T, 11-6T, 11-7T, 11-8T, 11-9T. Offill also confronted Owen for dumping shares of his Clearvision stock early, thus causing the price to decline significantly prior to the completion of the pump phase of the scheme. J.A. 1569-74; Govt. Exh. 11-4T, 11-7T.

## SUMMARY OF ARGUMENT

The district court did not err when it permitted two government experts to testify to "general securities law concepts" that were part of the evidence in the

case.  The court did not plainly err by admitting testimony by Stocker and Lindberg about securities issues that were included in documents and that they discussed with Offill during the conspiracy.

The district court did not abuse its discretion when it admitted portions of recorded telephone calls with Offill as intrinsic evidence and all of it pursuant to Federal Rule of Evidence 404(b).  The evidence was from late 2006 and early 2007 and showed Offill's knowledge of spamming in the charged transactions from 2004 and his knowledge and intent in connection with the Clearvision International pump-and-dump scheme that was nearly identical to the charged transactions.  The evidence was relevant, necessary, and reliable.  Moreover, the limited nature of the evidence and the court's limiting instructions diminished any risk of undue confusion.

The district court did not abuse its discretion by denying Offill's request for a multiple conspiracies instruction where the evidence clearly showed a single conspiracy where Offill evaded stock registration requirements to get stock into the hands of co-conspirators for pump-and-dump operations.  Offill also failed to show that he was only involved in separate conspiracies unrelated to the overall goal of the charged conspiracy.

The district court did not clearly err in its determination of gain attributable to Offill and in its denial of his request for a role reduction. Moreover, the court's sentence was not unreasonable where it varied 72 months below the applicable guidelines range.

## ARGUMENT

I. **THE DISTRICT COURT DID NOT ERR BY ADMITTING EXPERT AND LAY TESTIMONY ABOUT ARCANE EXEMPTIONS TO SECURITIES REGISTRATION REQUIREMENTS**

A.     <u>Expert Testimony Procedural Background</u>

Prior to trial, the government provided a detailed notice that it intended to call expert witnesses, including Professor Steve Thel of Fordham University and Commissioner Denise Crawford of the Texas State Securities Board, as experts on general securities law concepts and practice, including securities registration, exemptions from registration, and restricted and unrestricted securities. J.A. 230-35. Offill filed a motion *in limine* specifically asking the court to enter an order precluding the government's experts from offering "legal conclusions" and from opining on the "legal consequences" of his or his alleged co-conspirators' actions. J.A. 222, 227. He sought to limit the government's experts' testimony to "general securities law concepts." J.A. 227.

After briefing and argument, the district court noted that the law "allows experts properly qualified to talk about the functioning of the securities markets, the ordinary practices and procedures, the rationale behind those policies and procedures and the regulations that apply." J.A. 269. The court denied Offill's motion but ruled that government experts could not opine that conduct was "illegal manipulation, or that a party acted unlawfully, or that an entity or individual is liable." J.A. 268. The court also precluded the government from asking any question regarding Offill's intent. *Id.* The court pointed out that "hypotheticals can at times get a little close to the line, if, obviously, tailored specifically to the conduct here." J.A. 269.

Recognizing the fine distinctions between admissible and inadmissible expert testimony, the court invited Offill to object if he believed the government had crossed the line. *Id.* Offill did not object to any of the experts' testimony in the government's case-in-chief.

The government recalled Professor Thel and Commissioner Crawford in its rebuttal case. J.A. 2131-34. Offill objected on the grounds that the government should not be permitted to admit rebuttal expert testimony when Offill testified to his understanding of the law. The court overruled Offill's objection and permitted the expert testimony on the grounds that Ofill had raised new securities law

defenses in his testimony and had made factual claims about Commissioner Crawford's views on Rule 504 and TAC § 139.19.  J.A. 2134.  Offill did not object during the experts' rebuttal testimony.

B.    Standard of Review

The admission of expert testimony is reviewed for abuse of discretion where a party timely objects, and for plain error where it does not.  *United States v. Perkins*, 470 F.3d 150, 155 (4th Cir. 2006); *United States v. Olano*, 507 U.S. 725, 734 (1993).  With the admission of expert testimony, a trial court is afforded the "broadest degree of latitude."  *United States v. Hopkins*, 310 F.3d 145, 151 (4th Cir. 2002).  If the district court abused its discretion, this Court conducts a harmless error review to determine whether the error affected the defendant's substantial rights.  *United States v. Heater*, 63 F.3d 311, 325 (4th Cir. 1995).

Offill claims that an abuse of discretion standard applies to the Court's review of the admission of the expert testimony.  Def. Brief, 24.  He concedes the Court should review his lay-opinion-testimony claim for plain error.  Def. Brief, 33.  In light of Offill's concession in his motion *in limine* that the government could appropriately question the experts about "general securities law concepts," the district court's request that he object if he believed the expert testimony "crossed the line," his eliciting the types of information on cross-examination of

17

the expert witnesses that he complains of here, and his failure to object during

either expert's testimony, the government believes that Offill failed to make timely

and specific objections to the expert testimony and that this Court's review should

be for plain error only.  *Cf. United States v. Williams*, 81 F.3d 1321, 1325-26 (4th

Cir. 1996); *Wilson v. Williams,* 182 F.3d 562, 563 (7th Cir. 1999) (*in limine* motion

preserves an issue for appeal, but where district judge indicates need for further

consideration at trial or there are issues about how the evidence is used, failure to

object means forfeiture).

    C.    <u>Analysis of the Issue</u>

        I.    <u>The District Court Did Not Err by Admitting Expert Testimony
Related to Complex Securities Registration Violations</u>

The registration violation scheme alleged in the indictment focused on an

obscure area of securities practice—private placements under Regulation D of the

Securities Act of 1933 and Texas blue sky law counterparts—that is not only

highly complex and arcane, but is familiar to only a small sliver of the investing

public.  As Offill acknowledges, the regulatory scheme at issue in the case is

"specialized" and "tortuous."  Def. Brief, 35-6.

The government offered expert testimony to provide the jury with the

necessary background to understand the many complex issues related to the

regulatory landscape at issue in the case. Professor Thel and Commissioner Crawford gave the jury a basic primer on the penny stock securities market, in particular, Rule 504 stock issuances. In doing so, they explained the meaning of securities terms that the average juror might not understand. Of particular issue to this appeal, they also explained the registration process, the meaning of the term "underwriter," and how companies raise money through the sale of restricted stock using exemptions from registration pursuant to Rule 504 and TAC § 139.19. J.A. 325-26, 329-30, 373-81; Def. Brief, 27. In short, this testimony went no further than what Offill agreed in his pretrial motion *in limine* should be admitted: "general securities law concepts." J.A. 227. Consistent with that, Offill did not object once during the experts' testimony.

The touchstone for determining the admissibility of expert testimony is whether it is helpful. *United States v. Perkins*, 470 F.3d 150, 157 (4th Cir. 2006); Weinstein's Federal Evidence § 702.03[1]. Federal Rule of Evidence 702 provides that "[i]f . . . specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise." An expert may also testify in the form of an opinion on an ultimate issue, other than on the defendant's mental state. Fed. R. Evid. 704(a) and (b).

Offill claims that the government's experts offered improper legal opinions that should have been excluded as unhelpful. Def. Brief, 28. Generally, "[e]xpert testimony that *merely* states a legal conclusion is less likely to assist the jury in its determination." *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002) (emphasis added). The rationale is that such testimony "supplies the jury with no information other than the witness's view of how the verdict should be read." Weinstein's Federal Evidence § 704.04[2][a].

Although courts have excluded expert testimony drawing legal conclusions based on the facts of a case,[6] this Court has recognized that "in some circumstances, opinion testimony that arguably states a legal conclusion is helpful to the jury." *Barile*, 286 F.3d at 760 n.7, 761 (permitting expert testimony that defendant's submissions to the Federal Food and Drug Administration were "reasonable"); *see, e.g., Perkins*, 470 F.2d at 159-60 (expert testimony regarding "reasonableness" of defendant's use of force did not state impermissible legal

---

[6] *See, e.g., Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 365, 368 (4th Cir. 1986) (excluding testimony in civil securities fraud case by expert that "there existed no legal requirement" requiring defendant to disclose particular negotiations that were at the core of the dispute); *Torres v. County of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985) (excluding expert testimony that company had not "discriminated"; lay opinion testimony); *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988) (excluding expert testimony that actions taken by investment house constituted "fraudulent and manipulative scheme").

conclusion); *United States v. Mohr*, 318 F.3d 613, 624 (4th Cir. 2003) (due to "obscure" nature of testimony on training and use of police dogs, expert permitted to testify that defendant's actions violated "prevailing police practices," defendant's release of police dog was "inappropriate," defendant had "plenty of time to give [a K-9 warning]," and there was "no reason" not to give such a warning); *see also Peckham v. Continental Casualty Ins. Co.*, 895 F.2d 830, 837 (1st Cir. 1990) (expert testimony on proximate cause in insurance bad faith case permitted due to complexity of insurance law).

One way courts determine whether opinion testimony contains improper legal conclusions "is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular." *Barile*, 286 F.3d at 760 (internal citation and quotation marks omitted). The concern is that such expert testimony creates the danger of confusion where the legal terminology has a different meaning to lawyers than lay people. Weinstein's Federal Evidence § 704.04[2][b].

Here, Offill claims that the government's experts impermissibly testified in the language of statutes and regulations. In the government's case-in-chief, the experts described the regulatory landscape at issue, providing helpful testimony on a highly complex area of securities practice to assist the jury in understanding the

21

pertinent terms and concepts. Critically, in their testimony, the experts did not—as in *Adalman*, *Scop*, *Torres*, and the other cases cited by the defense—apply the language of the governing law to the facts of the case. Rather, the experts here testified about securities terms and concepts that were part of the evidence of the case. J.A. 323-51, 371-80. In other words, the experts here explained the very terminology that Offill and Stocker used in legal opinion letters and subscription agreements, as well as in discussions about the sham transactions. Moreover, the experts did not apply the legal terminology to the facts of the case; rather, they explained the terms, providing the jurors the very "general securities law concepts" they needed in order to understand the securities terms, concepts, rules, and regulations that Offill used to build his registration-evasion scheme. *Id.*

For example, Offill complains that Professor Thel testified about concepts such as when a stock needs to be registered. Def. Brief, 27. In addition to being a central concept in the case, Professor Thel testified in the government's case-in-chief about the meaning and purpose of registration because Offill made it an issue in the case. In subscription agreements that Offill helped draft and signed when pretending to purchase Issuers' stock, he claimed that the stock issuances were exempt from registration:

> The Offering is being conducted in reliance upon the *exemption* from the *registration requirements* of the Securities Act of 1933 (the Act) set forth in Rule 504 of Regulation D promulgated under the Act, Sections 5.I, 5.T and 7 of the Texas Securities Act, Rule 139.19 of the Texas Administrative Code, and the Regulations promulgated thereunder.

J.A. 2859 (emphasis added); Govt. Exh. 1-6; *see also* ¶ 3.K. of Govt. Exh. 1-6 at J.A. 2591.

Offill also claims the experts testified impermissibly when explaining how companies issued restricted stock in reliance upon Rule 504 and TAC § 139.19. Def. Brief, 27. Yet, as the prior example demonstrates, Offill used Rule 504 and TAC § 139.19 as a central basis of his registration scheme and identified them in the subscription agreements as the basis for not registering the stock. *Id.* Indeed, Offill and Stocker explained in some detail their reliance upon Rule 504 and TAC § 139.19 in legal opinion letters (signed by Stocker and reviewed by Offill) that were designed to give their sham transactions a patina of legitimacy. J.A. 433-34, 442-44, 495-96, 2596-99; Govt. Exh. 1-7. In addition, as Stocker testified, he and Offill discussed how they could use these rules to "get around" the registration requirements. J.A. 438-39, 491.

Professor Thel's testimony about underwriters was no different. Offill advised Stocker how they could avoid being identified as underwriters by relying

on TAC §§ 139.16 and 139.19, and directed Stocker to include a disclaimer in the legal opinion letter used in connection with the stock issuances to make clear that Stocker was not opining on underwriter status.  As Stocker explained, he included this language at Offill's instruction to shield himself from scrutiny by regulators. J.A. 441, 445-47, 497-98, 547, 2598; Govt. Exh. 1-7.  As a result, Offill's criminal actions injected the meaning of the term underwriter and the factual issue of what constituted an underwriter into the case.  Professor Thel thus appropriately gave the jury information and context it needed to understand the meaning and significance of this evidence.[7]  Thus, while Professor Thel may have used terms that were contained in statutes and regulations, he did so because Offill himself used those identical terms in the documents he helped draft to cover up his criminal scheme and in the conversations he had with co-conspirators.

Offill's challenge to Commissioner Crawford's case-in-chief testimony is equally unavailing.  *See* Def. Brief, 28.  Commissioner Crawford did not apply legal concepts to the facts of the case; rather, she testified about Texas securities practice and legal concepts that Offill made relevant to the case through

---

[7] Just as the court instructed the jury on the requirements of Rule 504 and TAC § 139.19, it also instructed the jury on the term "underwriter."  J.A. 2328-30.  Offill makes no claim that Professor Thel's testimony was inconsistent with the court's instructions.

24

documents and conversations he had about these issues.  For example, his claim that Commissioner Crawford impermissibly testified about how TAC § 139.19 operated is undermined for the reasons identified above: the subscription agreements and legal opinion letters identified § 139.19 as one basis for why the stock did not need to be registered.[8]  Contrary to Offill's claim (Def. Brief, 32), the purpose of Commissioner Crawford's testimony was not to instruct the jury on the law—the district court instructed the jury on Rule 504 and TAC § 139.19—but rather to provide, in addition to general background on securities practice, an explanation of the securities terms Offill and Stocker used in their scheme to cover up their efforts to evade registration requirements.[9]

_____

[8] Offill's claim that Commissioner Crawford's testimony on TAC § 139.14 was impermissible ignores the fact that Offill elicited this testimony from her.  J.A. 381, 384.  The defense attempted to raise this, Rule 144, and TAC § 139.13, at trial as alternative exemptions Offill could have relied upon, and they elicited testimony about these exemptions from Professor Thel and Commissioner Crawford.  J.A. 366-67, 381, 384-86.  Ultimately, they abandoned this defense as they withdrew their jury instruction based on Rule 144 and TAC § 139.13 and never offered one on TAC § 139.14.  J.A. 1902, 2032-33, 2243-44.

[9] Although Offill does not directly raise the "investment intent" issue in his argument, Commissioner Crawford testified to the requirement under TAC § 139.19 that a purchaser must buy stock from an issuer with "investment intent" and what that term generally meant.  J.A. 379.  Offill made this an issue in the case by representing in each subscription agreement that he was "purchasing" stock from the Issuers for "investment purposes," a clear reference to the "investment intent" requirement of TAC § 139.19 cited a few paragraphs earlier in the subscription agreements.  J.A. 2589; Govt. Exh. 1-6.  Stocker also testified about his conversations with Offill in

Moreover, the terms used by the experts did not have "specialized meaning" in the law that was different from that in the vernacular. *Barile*, 286 F.3d at 760. For example, in *Torres*, the Sixth Circuit excluded testimony that a company had not "discriminated," a term that had particularized meaning in case law that did not necessarily match the meaning lay people attach to it, thus risking confusion in how the jury would make use of this evidence. 758 F.2d at 151; Weinstein's Federal Evidence § 704.04[2][b].[10] Likewise, in *Scop*, the excluded terms, "fraudulent and manipulative scheme," have particularized meaning under securities laws that subtly diverge from colloquial use, thus raising the possibility of jury confusion. 846 F.2d at 140.

Here, many of the terms the experts used that Offill complains of—registration, exemption, general announcement—do not have a meaning in the law that differs in a meaningful way from general use, and thus there was little chance of confusion by the jury. The experts' use of a highly specialized term like "underwriter" also did not create a danger of confusion where the term was clearly

---

which Offill described how they could "get around" the "investment intent" requirement of TAC § 139.19. J.A. 438-39. Commissioner Crawford's testimony was consistent with the district court's jury instruction on this law. J.A. 2329.

[10] *Torres* actually deals with lay opinion testimony, but the principle remains the same. 758 F.2d at 149.

defined by the court and is not commonly used in the vernacular. *Cf. United States v. Cohen*, 518 F.2d 727, 737 (4th Cir. 1975) (in "involved" securities case, trial court did not abuse its discretion in admitting helpful testimony about "the reach of the concepts of 'underwriter' and 'materiality'"). Similarly, while Offill has not pointed to any particular language that had "specialized meaning" that was used by the experts in connection with Rule 504 and TAC § 139.19, the statutes were clearly defined by the court and the experts' terminology was intentionally designed for easy understanding by lay people. J.A. 337-40, 343-44, 376-77, 378-80, 2327-30.

Offill points to two instances where the government's experts went further than providing general securities law concepts. Def. Brief, 27-8. What Offill omits to mention, however, is that this testimony came in the government's rebuttal case, where the experts responded to issues raised by Offill's own testimony. *Cf. Mohr*, 318 F.3d at 624-25 (expert testimony on "reasonableness" in excessive force case permissible to rebut defendant's testimony that actions were reasonable and consistent with training).

The government recalled the experts after Offill's testimony in which he claimed for the first time that, in addition to Rule 504 and TAC § 139.19, he had also relied on Rule 144 and TAC §§ 139.13 and 139.14. J.A. 381, 384-86. In

rebuttal, Professor Thel testified about Rule 144 and the factual contours of what constituted an underwriter. In response to a hypothetical about underwriter status where an initial accredited investor of shares transferred shares purchased with a promissory note to another for sale to the public, Professor Thel stated that "[i]f [the initial accredited investor] had no intention of paying the promissory note, and this were a structure to get around the statute, I think the situation becomes worse." J.A. 2146-47; Def. Brief, 27.

Contrary to Offill's claim (Def. Brief, 27), Professor Thel was not opining on Offill's intent or drawing legal conclusions about his actions. Professor Thel did not reference Offill or opine that Offill had a view toward distributing shares publicly; rather, he kept his testimony general. He also couched his response in the conditional ("[i]f . . . no intention of paying the promissory note"; "[i]f . . . this were a structure to get around the statute"), thus leaving the jury to determine whether, under the facts elicited at trial, Offill or any of the other co-conspirators intended to pay for the shares or were setting up a structure to circumvent the law. And, lastly, as Professor Thel explained, an underwriter is a person who buys with a view toward distribution, and rather than opining that Offill or any co-conspirator had that intention, he merely stated that under the facts of the hypothetical, "the situation becomes worse" and that the "underwriter status

[becomes] more clear." J.A. 2146-47. He thus left it to the jury to determine whether Offill had such an intent.

Commissioner Crawford testified in rebuttal regarding TAC § 139.14, a statute that Offill raised as a defense in his testimony. When asked whether this rule permitted an accredited investor to transfer shares to another so that person could sell shares publicly, as Offill claimed during his testimony, Commissioner Crawford stated that it did not: "In fact, we would call that a scheme to evade the registration requirements if that were done." J.A. 2180; Def. Brief, 28. Like Professor Thel, Commissioner Crawford did not apply her statement to the facts of the case or identify Offill as having done this. Rather, she testified in the conditional, noting that "if that were done" she would consider it a scheme to evade registration requirements. The key factual issue for the jury was whether Offill had ever given his shares to another person *in order for* that person to sell those shares publicly. Commissioner Crawford never opined on whether Offill had this intent.

Offill also claims that, in its closings, the government improperly suggested that the jury had to follow the law announced by its experts. Def. Brief, 31-2. On the contrary, the government highlighted for the jury the glaring inconsistencies between, on the one hand, Offill's repeated and bold claims that the stock

29

issuances he designed and his stock distributions did not need to be registered and, on the other, the government's experts' descriptions of how restricted stock issuances under the federal and Texas regulatory schemes actually operated. J.A. 2201-02, 2278. The purpose of the arguments was to emphasize Offill's lack of credibility. By juxtaposing his motives for painting a favorable depiction of the regulatory framework with those of experts, the government appropriately and legitimately attacked the believability of his position. J.A. 2278.[11]

Offill claims the government's arguments, in combination with the expert testimony, "wrested the obligation to instruct the jury from the trial court and told the jury how to decide the case." Def. Brief, 32. In fact, the district court instructed the jury on the securities rules and terms at issue in the case, including Rule 504, TAC § 139.19, and the meaning of the term "underwriter." J.A. 2327-30. Not only was the government's expert testimony entirely consistent with the judge's instructions, but there was little danger that the jury would confuse the judge's role as the sole instructor of the law. The district court advised the jury at

---

[11] Offill argues that he was further prejudiced by the district court's having precluded him from testifying as an expert. Def. Brief, 31 n.6. The court properly instructed Offill not to testify as an expert, in part, because he failed to provide expert notice. J.A. 1829-32. Instead, the court allowed Offill to testify to his understanding of the securities laws and registration issues in the case. *Id*. The difference between these two modes of testimony was minor and hardly prejudicial.

the outset that the judge would provide instructions on the applicable law and that the jury must follow these instructions. J.A. 251-52. The district court also stated in its closing instructions that the jury could disregard the expert testimony if it found it unconvincing. J.A. 2306-07. Perhaps even more significantly, the defense itself made clear to the jury the limited role of the experts during its cross-examination of Professor Thel at the commencement of the case:

> Q. Now . . . is it correct that you understand that in a trial setting when it comes time for the jury to be told what the law is and what different rules and statutes and regulations mean, that is the judge's job in jury instructions, isn't that right?
>
> A. I am counting on that, yes.
>
> Q. You are not here intending in any way to steal the thunder from Judge O'Grady or take his job, are you?
>
> A. No, nor yours. That's correct, nor the jury's. Other people decide these things . . . .

J.A. 358. As for the jury's role, the government's experts did not opine on how the jury should apply the law to the facts of the case or whether Offill violated the law, acted willfully, sold shares with a view toward distribution, or engaged in a scheme to evade the registration requirements. Moreover, the court repeatedly reminded the jury in its final instructions that the jury alone was the judge of the facts. J.A. 2297, 2301, 2304-05, 2307.

As the government's experts did not testify improperly, this Court need not conduct a harmless or plain error review. To the extent the Court finds error, under either a harmless or plain error review such error would not mandate reversal. Offill's guilt was sealed by his testifying co-defendants, the documents showing his involvement in the scheme, and his own testimony. *See* J.A. 2550 (according to the court, "one of the biggest pack of lies that I think I have ever heard from any defendant testifying in all my years of trial litigation"). While the experts' roles were not insubstantial, they provided only "general securities law concepts" for the jury. Their testimony was not only corroborated by other witnesses, such as Stocker and Lindberg, but also was consistent with the district court's instructions on the applicable law. Moreover, even if error, the experts' testimony was directed at the registration-evasion object of the conspiracy charge, and only indirectly touched on the stock-manipulation objects of the conspiracy and on wire fraud counts four and six of which Offill also was convicted.[12] As the

---

[12] The jury found Offill guilty of each object of the conspiracy (registration evasion, securities fraud, and wire fraud), as noted on the special verdict form. The verdict form is not included in the Joint Appendix. J.A. 11 (docket # 111).

expert testimony did not relate to the stock-manipulation aspect of the scheme, any

error would not require review, let alone reversal, of those verdicts.[13]

      ii.    <u>The District Court Did Not Plainly Err By Admitting Lay</u>
<u>Opinion Testimony of David Stocker and Mark Lindberg</u>

Federal Rule of Evidence 701 governs the admission of lay opinion

testimony:

> If the witness is not testifying as an expert, the witness' testimony in
> the form of opinions or inferences is limited to those opinions or
> inferences which are (a) rationally based on the perception of the
> witness, (b) helpful to a clear understanding of the witness' testimony
> or the determination of a fact in issue, and (c) not based on scientific,
> technical, or other specialized knowledge within the scope of Rule
> 702.

As with Rule 702, an important component of the admissibility determination is

whether the testimony would be helpful to the jury. *United States v. Fowler*, 932

F.2d 306, 312 (4th Cir. 1991). Lay witnesses may testify to ultimate issues and,

unlike with expert witnesses, Rule 704(b) does not prohibit lay witnesses from

opining on a defendant's intent. *See* Fed. R. Evid. 704(a); Fed. R. Evid. 704(b)

("No *expert* witness testifying with respect to the mental state or condition of a

---

[13] Offill has not challenged the sufficiency of the stock manipulation objects
of the conspiracy, of which he was convicted. The stock manipulation evidence was
overwhelming. It was based on co-conspirator testimony, bank and trading records,
and other documents. J.A. 470-617, 805-06, 868-938, 901-02, 934-36, 960-71, 982-
1010, 1028-39, 1057-65, 1151-77.

defendant in a criminal case may state an opinion or inference . . . .") (emphasis added); *United States v. Rea*, 958 F.2d 1206, 1214-15 (2d Cir. 1992) (lay opinion testimony on mental state not prohibited by Rule 704).

Courts guard against lay opinion testimony involving "meaningless assertions which amount to little more than choosing up sides." *Mattison v. Dallas Carrier Corp.,* 947 F.2d 95, 110-11 (4th Cir. 1991) (quoting Fed. R. Evid. 701, Advisory Committee Note). However, this Court and others have permitted lay opinion testimony that goes beyond the limitations of the witness's perception and which requires inferences drawn from personal experience, even where specialized knowledge is involved. *See, e.g., Fowler*, 932 F.2d at 312 (admitting lay opinion testimony that defendant would know the rules about the treatment of classified budget documents and the prohibition on disclosing them to contractors, based on the foundation that the witnesses were familiar with the documents, their classification and reasons therefor, and defendant's work with such documents); *MCI Tele-communications Corp. v. Wanzer*, 897 F.2d 703, 706 (4th Cir. 1990) (profit projections based upon personal knowledge admissible under Rule 701); *United States v. Riddle*, 103 F.3d 423, 428-29 (5th Cir. 1997) (reviewing cases where courts have permitted lay witnesses to testify to opinions based on special knowledge developed through personal experience).

Here, Stocker and Lindberg testified about the transactions they conducted with Offill. They described not only their understanding of how the charged transactions worked, but also their communications with Offill about how they could use Rule 504 and TAC § 139.19 to evade registration requirements. J.A. 435-41, 488-89, 785-90, 792-95. Stocker, as a securities attorney, had a deep understanding of the securities laws at issue in the case, and he testified that he knew that the transactions he and Offill devised were designed to give the false appearance of complying with the law. J.A. 440, 487, 496-97, 604, 606. In that context, he explained how Offill advised him on Rule 504 and TAC § 139.19 and instructed him on particular legal language to add to subscription agreements and legal opinion letters to fool regulators, including language about underwriter status. J.A. 435-46. Lindberg, who worked with Offill to create and sell shell companies, also had extensive discussions with Offill about Rule 504 offerings. J.A. 785-90, 792-95. Thus, Stocker's and Lindberg's testimony about securities issues, including registration exemptions, underwriter status, investment intent, and Rule 504 and TAC § 139.19, was based largely on their personal experiences and interactions with Offill. As such, their testimony was relevant and helpful, and it did not amount to mere "choosing up sides." *Mattison*, 947 F.2d at 110-11.

In challenging Stocker's testimony, Offill repeatedly misconstrues the context. For example, he identifies as improper those statements where Stocker testified that his own conduct was "fraudulent," "securities manipulation," or "illegal." Def. Brief, 34. However, a number of Offill's examples come from testimony by Stocker where he described his criminal conduct prior to or after working with Offill. J.A. 410, 411, 412, 415, 418-19. On the few occasions where Stocker used the terms "fraudulent" or "illegal" in connection with the charged transactions, he was referring to his understanding of the law, his own conduct, or that of other co-conspirators, such as promoters. J.A. 548, 573, 613, 615, 619, 638. Stocker never specifically identified Offill as having done anything "fraudulent" or "illegal" or that amounted to "securities fraud."

Offill also complains about Stocker's testimony regarding a "scheme or plan to evade registration requirements." Def. Brief, 35. Stocker's actual testimony was that Offill directed him to add that language, which was part of the preamble to Regulation D, to the subscription agreements in order to fool regulators. J.A. 482, 488-90, 541-43. And while Stocker testified that no one involved in the charged transactions had "investment intent," this testimony was based not only on his having devised the transaction with Offill, but also on communications with Offill about adding language to subscription agreements to "get around [the]

investment intent" requirement. J.A. 431-32, 436-38. Thus, Stocker was not applying abstract legal principles to Offill's conduct; rather, he was testifying to the specific actions and words used by them in carrying out the scheme.

Offill's biggest complaint appears to be that Stocker and Lindberg described him as acting as an underwriter. Def. Brief, 35; J.A. 445-47, 797-98.[14] As Stocker explained, Offill instructed him to add an underwriter disclaimer to his legal opinion letter to minimize his exposure. J.A. 443-44, 446. To explain why this language was significant, Stocker, an experienced securities lawyer, appropriately described what he understood an underwriter to be; the consequences of being deemed an underwriter (a registration statement would have to be filed); and his conversations with Offill about the underwriter issue. J.A. 445-46. Based on Stocker's own involvement in the charged transactions and his extensive communications with Offill on the underwriter issue, the testimony that he, Offill, and others acted as underwriters was simply a factual assessment by him based on

---

[14] It is not a crime to be deemed an underwriter. The indictment charged Offill with conspiring to evade registration requirements. J.A. 26-27. As the district court explained, if a person is deemed an underwriter, he is not exempt from filing a registration statement. J.A. 2329-30. Thus, while being deemed an underwriter does not invoke criminal sanction, *willfully* covering up one's underwriter status in a scheme to evade registration is a crime. *See* 15 U.S.C. §§ 77d(1), 77e, and 77x.

his own experience in conducting the scheme. This type of testimony is entirely consistent with this Court's *Fowler* and *MCI Telecommunications* decisions.

Lindberg, who had extensive securities experience and interactions with Offill on how to conduct Rule 504 transactions, testified that he knew he had acted as an underwriter when he served as an initial accredited investor. J.A. 797. Lindberg did not testify that Offill acted as an underwriter; rather, he pointed out that, just as he knew he had been an underwriter when acting as an initial investor, Offill also had served as an initial investor. J.A. 798. Lindberg's assessment of his own conduct was factual in nature, are hardly a conclusion of law, and his observation that Offill also acted as an initial investor was based in fact and cannot qualify, as Offill suggests in his brief, as an example of a witness applying legal concepts to the facts of the case. Def. Brief, 35.

Offill cites three cases from other circuits—*United States v. Griffin*, 324 F.3d 330 (5th Cir. 2003); *United States v. Espino*, 32 F.3d 253 (7th Cir. 1994); and *Torres v. County of Oakland*, 758 F.2d 147 (6th Cir. 1985)—for the proposition that courts carefully restrict lay opinion testimony when it relates to complex areas of law. Def. Brief, 35-6. However, these cases are factually distinct from the circumstances here. In *Griffin*, the court permitted a witness to testify about her understanding of state ethics rules and what employees had been instructed on

them, much as Stocker testified about his understanding of Rule 504 and TAC §
139.19 and his discussions with Offill about them. 324 F.3d at 347-48. The Fifth
Circuit found error, though harmless, where the witness read statutes and
answered hypotheticals about the applicability of those statutes, something that
went far beyond Stocker's and Lindberg's testimony in this case. *Id.* In *Espino*,
the court found fault with the prosecutor cross-examining the defendant on
whether he had committed the charged "conspiracy." 32 F.3d at 257-58. Here,
Stocker, who had pleaded guilty, testified to his understanding that what he had
done was "illegal" and that some of the promotions conducted by his co-
conspirators (which, as Offill readily points out, he had nothing to do with) were
"illegal." This testimony did not directly implicate Offill and was instead
Stocker's acknowledgment that he had been involved in criminal activity. In
*Torres*, the Sixth Circuit ruled that the admission of testimony that a defendant
had not "discriminated" against the plaintiff was inadmissible because it stated a
legal conclusion. 758 F.2d 149-51. Stocker and Lindberg, on the contrary, did not
apply the governing law to the facts of the case; rather, they testified, based on
their interactions with Offill, to concepts that were part of the evidence of the case.

    To the extent there was any error, Offill has not shown that it was plain and
affected his substantial rights, as is his burden. Much of the evidence Offill

identifies either related to Stocker's transactions before or after working with Offill or related to Stocker's descriptions of how he and Offill devised transactions specifically to evade the requirements of Rule 504 and TAC § 139.19. There was substantial, corroborative documentary evidence that, despite Offill having agreed approximately fifty-one times in subscription agreements to hold stock for investment for up to a year, he in fact caused the shares to be transferred to others to be sold publicly, all within days of the issuance. *See, e.g.,* J.A. 480-81, 532-34, 601-03, 1633-38; *see, e.g.,* Govt. Exhs. 1-5(a), 1-5(b), 1-6, 2-7, 2-9(a), 2-9(b), 3-5, 3-9(a), 3-9(b), 30. Moreover, numerous additional witnesses, including Luscko, Neu, Mohamad Motazedi, Brian Brunette, and Tyson Su testified that creating a public distribution of shares was the purpose of the scheme, thus corroborating Stocker and Lindberg's claims. J.A. 883, 989, 1036-37, 1060-62. Finally, the testimony about which Offill complains relates primarily to the registration object of the conspiracy, not the other objects or wire fraud counts four and six. Thus, any error was not so significant as to undermine the integrity of the verdicts.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ADMITTING EVIDENCE FROM LATE 2006 AND EARLY 2007 TO PROVE OFFILL'S KNOWLEDGE AND INTENT OF THE CHARGED TRANSACTIONS FROM 2004

### A. Procedural Background

Pretrial the government filed a motion *in limine* to admit evidence from late 2006 and early 2007 of Steve Luscko's interactions with Offill during which Offill admitted his knowledge of spamming in 2004, and of Luscko's and Ken Owen's interactions with him on the Clearvision pump and dump. The government sought to admit the statements about the 2004 spamming as intrinsic and the entirety of the evidence, including that related to Clearvision, pursuant to Federal Rule of Evidence 404(b). J.A. 99-134. The parties filed extensive briefing on the issues. J.A. 7, 135-162; *see also* J.A. 7 (docket # 59, 60). The court held a hearing on December 11, 2009. J.A. 163-99. The court also requested for review certain transcripts of recorded calls with Offill. J.A. 188-92. On December 23, 2009, the court issued an order admitting the evidence. J.A. 200-04. It reasoned that Offill's discussions about spamming in 2004 were admissible both as intrinsic evidence as admissions and pursuant to Rule 404(b) to show his knowledge and intent. J.A. 202-03. It ruled the Clearvision evidence was admissible pursuant to Rule 404(b) because it was "highly probative" of Offill's knowledge of how a

market manipulation scheme generally works and how the Emerging Holdings, MassClick, and China Score schemes operated; Offill had linked the spamming in the Clearvision transaction and the Emerging Holdings, MassClick, and China Score deals in the recorded conversations, thus showing his knowledge of spamming in connection with the 2004 transactions; this link was "highly relevant" to show his involvement in the charged scheme was not an accident; it could be used to rebut any claim, such as that made by Offill before the grand jury, that he was not aware of the actions of his co-conspirators; and the similarity of the evidence overcame any objection to the time that had elapsed between schemes. J.A. 203-04. The court also conducted a balancing analysis pursuant to Federal Rule of Evidence 403, and it found that the probative value was not substantially outweighed by any prejudice. J.A. 204.

At trial, the court read a limiting instruction to the jury prior to admitting this evidence during Luscko's testimony. J.A. 1407-08. The court reminded the jury of this instruction during Owen's testimony. J.A. 1552. Further, it also instructed the jury again on the limitations of extrinsic evidence during its final instructions. J.A. 2315.

B.    <u>Standard of Review</u>

The decision to admit evidence pursuant to Rule 404(b) of the Federal Rules of Evidence is reviewed for an abuse of discretion.  *United States v. Aramony*, 88 F.3d 1369, 1377 (4th Cir. 1996).  A district court's ruling should not be overturned "except under the most extraordinary of circumstances."  *Id.* (internal quotation marks and citations omitted.)  Such a ruling will not be disturbed unless it is "arbitrary or irrational."  *United States v. Van Metre*, 150 F.3d 339, 349 (4th Cir. 1998) (citing *United States v. Powers*, 59 F.3d 1460, 1464 (4th Cir. 1995)).

C.    <u>Analysis of the Issue</u>

Portions of the government's evidence related to Offill's statements to Luscko about his knowledge of spamming in 2004 was direct evidence of Offill's knowledge of the charged crimes and thus was admissible as intrinsic act

evidence.[15]  The entirety of this evidence and all of the Clearvision evidence was admissible pursuant to Rule 404(b).

Rule 404(b) evidence is admissible for purposes other than proving that the character of a person conforms with this extrinsic evidence.  *See* Fed. R. Evid. 404(b); *United States v. Queen*, 132 F.3d 991, 994 (4th Cir. 1997).  The admissible purposes for which such evidence can be admitted include, among other things, "intent . . . knowledge . . . or absence of mistake or accident."  *Id.*  This Court construes the rule as being inclusionary.  *Aramony*, 88 F.3d at 1377.  The four-part test for admission pursuant to Rule 404(b) requires that evidence be (1) relevant to an issue other than character, (2) necessary, and (3) reliable; and (4) the probative value of the evidence must not be substantially outweighed by confusion or unfair prejudice.  *Queen*, 132 F.3d at 996.

---

[15] Acts intrinsic to the charged crimes do not fall under Rule 404(b)'s limitations on admissible evidence.  *See United States v. Chin*, 83 F.3d 83, 88 (4th Cir. 1996).  Portions of the December 14, 2006, and January 9, 2007, recordings in which Offill acknowledged his awareness of Luscko's and Neu's connection to the Emerging Holdings, MassClick, and China Score transactions and their use of Medlin as a spammer on those deals clearly constituted intrinsic evidence.  For example, in the December 14 call, he admitted knowing that Greg Neu had been involved in "emailing activities" and strongly implied he was aware of Luscko and Neu having previously been involved in sending hundreds of millions of spam email.  J.A. 1413, 1418-22, 2624.  In the January 9 call, he asked whether Luscko was "gettin' back to the email business" and whether Neu had "access to some of the old email groups."  J.A. 1430-33, 2650-52.

To be relevant, the evidence must have "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Aramony*, 88 F.3d at 1377 (quoting Fed. R. Evid. 401). "In this regard, the more similar the prior act is (in terms of physical similarity or mental state) to the act being proved, the more relevant it becomes." *Queen*, 132 F.3d at 997. Evidence is "necessary" if "it is probative of an essential claim or an element of the offense." *Id.* This Court considers evidence reliable unless it is "so preposterous that it could not be believed by a rational and properly instructed juror." *Aramony*, 88 F.3d at 1378 (internal quotation marks and citation omitted).

Here, the district court conducted a thorough analysis of the issue. It also had the advantage of hearing opening statements and the testimony of numerous witnesses prior to Luscko's and Owen's testimony toward the end of the government's case-in-chief. Based on the court's close monitoring of the evidence, its decision to admit this evidence was hardly "arbitrary or irrational." *See United States v. Van Metre*, 150 F.3d 339, 349 (4th Cir. 1998).

Under the low threshold for establishing relevance, *see United States v. Powers*, 59 F.3d 1460, 1465 (4th Cir. 1995), the evidence here easily passed muster. Offill's statements about spamming in 2004 were highly material to

showing his contemporaneous knowledge of the illegal promotions that were charged in the indictment. That he might have come into possession of this information through his subsequent representation of Stocker before the SEC was a contested issue and goes to the weight, not the admissibility, of the evidence.

Offill's involvement in the Clearvision transaction in late 2006 and early 2007 was also highly probative of his knowledge and intent in 2004 when he participated in the nearly identical, charged transactions, particularly as he maintained that he was just providing legal advice to Stocker and had limited to no contact with the co-conspirators. J.A. 296-98, 300-09. The Clearvision evidence was also particularly relevant because Offill talked about using Medlin, a.k.a. The Kid, to spam in 2004 and in connection with Clearvision, thus drawing a direct link between his knowledge of spamming in the two sets of transactions. J.A. 2647-54, 2676-78, 2730-33; Govt. Exh. 11-2T, 11-5T, 11-9T.[16]

That these events took place more than two years after the end of the charged conspiracy does not preclude a finding of relevance. This Court has long recognized the admissibility of *subsequent* act evidence, particularly with regard to proving intent. *See United States v. Hadaway*, 681 F.2d 214, 217-18 (4th Cir.

---

[16] Clearvision is also referred to in the transcripts by its trading symbol, CVNI. *See, e.g.,* J.A. 2647.

1982) (involving evidence occurring 18 months after charged conduct, court stated that "subsequent conduct may be highly probative of prior intent. That one has thought in a particular illegal way over a period of time is evidence that one's thought patterns had already been so developed and were so operating on another previous occasion."); *United States v. DiZenzo*, 500 F.2d 263, 265 (4th Cir. 1974) ("it is immaterial whether the instances are found occurring before or after the act charged"); *see also United States v. Mohr*, 318 F.3d 613, 617, 620-21 (4th Cir. 2003) (evidence of 1998 excessive force admissible to prove defendant's willfulness related to 1995 excessive force charge); *United States v. Whaley*, 786 F.2d 1229, 1232-33 (4th Cir. 1986) (subsequent act evidence admissible; impact of the time differential is within district court's discretion). The length of time between incidents here is also not a barrier to admission. *See, e.g., Queen*, 132 F.3d at 997-98 (nine years between 404(b) evidence and charged offense).

In light of the close similarity of the subsequent evidence to the charged conduct, *see Queen*, 132 F.3d at 997, the time differential here did not diminish the evidence's relevance. Both the charged conduct and the Clearvision evidence involved nearly identical pump-and-dump schemes. Although Offill's role in the Clearvision transaction expanded to include hiring the promoter and spammer and enforcing the coordination of trading by co-conspirators, he still acted as the

attorney structuring the transaction to obtain free trading stock, distributed the stock to co-conspirators, and traded in the stock as he had done with Emerging Holdings and MassClick. J.A. 1554-58, 1570-78, 1581-84, 1605-10. More importantly, the schemes were nearly identical in scope and purpose, as they each involved the issuance of restricted stock as free trading stock in order to facilitate a pump and dump through spam email, fax blasts, and coordinated selling. This close similarity increased the relevance of the evidence of Offill's knowledge and intent in connection with the Clearvision deal to show his knowledge and intent in connection with the 2004 charged transactions.[17]

The necessity prong of the *Queen* test was also met. The evidence of Offill's knowledge of Luscko's, Neu's, and Medlin's role in spamming and his knowledge and intent in connection with the Clearvision scheme went to establishing essential elements of the charged crime: that he knew of the conspiratorial agreement and intended to join it. Clearly, the district court did not

---

[17] *United States v. Reinhardt*, 347 F.Supp.2d 222, 224 (D. Md. 2004), a case relied upon by Offill, is inapposite. Def. Brief, 43. In that case, the district court excluded Rule 404(b) evidence where the charged fraud involved the defendant making misrepresentations in a car lease, and the proffered Rule 404(b) evidence involved the defendant engaging in the theft and forgery of checks to pay for the lease. Here, the securities fraud schemes were nearly identical, and the Rule 404(b) evidence focused on the similarity of Offill's *intent*.

abuse its discretion in admitting the evidence in order to establish two key elements in this case. J.A. 296-98, 301-12, 313-18.

The evidence also easily cleared the reliability hurdle. As much of the evidence consisted of Offill's own statements, captured in recorded calls and in email, the evidence was not "so preposterous" that it could not be believed by a rational jury. *See Aramony*, 88 FF.3d at 1378. Its reliability was heightened the link between his efforts to hire Medlin to spam for Clearvision and his knowledge of Medlin's role as a spammer in 2004. J.A. 2647-54, 2676-78, 2730-33; Govt. Exh. 11-2T, 11-5T, 11-9T.

The district court also did not abuse its discretion when, after extensive review, it found the evidence's probative value not to be substantially outweighed by any undue prejudice. The evidence was highly probative of Offill's knowledge and intent, and thus any prejudice was directly related to the strength of the evidence. *Cf. United States v. Gilliam*, 994 F.2d 97, 100 (2d Cir. 1993). Here, without elaboration, Offill claims his conduct in Clearvision created "the serious potential of confusing the jury." Def. Brief, 44. Yet he fails to note that the district court instructed the jury twice prior to Luscko's and Owen's testimony concerning the limited use to which the evidence could be put. J.A. 1407-08, 1551-52. Moreover, in light of the evidence focusing on one additional

49

transaction, the court's instructions, and the limited nature of the evidence, which was submitted through two witnesses and portions of eight recordings, the district court did not act arbitrarily or irrationally in finding that the danger of undue confusion did not *substantially* outweigh the high probativeness of this evidence. J.A. 120-31, 1407-08, 1447, 1450-53, 1458, 1551-52, 1599, 1604; Govt. Exh. 11-1T, 11-2T, 11-4T, 11-5T, 11-6T, 11-7T, 11-8T, 11-9T.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DENYING OFFILL'S REQUEST FOR A MULTIPLE CONSPIRACIES JURY INSTRUCTION WHERE THE EVIDENCE ESTABLISHED A SINGLE CONSPIRACY

A.    Standard of Review

The standard of review for a trial court's refusal to give a requested instruction is abuse of discretion. *United States v. Brooks*, 928 F.2d 1403, 1408 (4th Cir. 1991). "A district court's refusal to provide an instruction requested by a defendant constitutes reversible error only if the instruction: (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Patterson*, 150 F.3d 382, 388 (4th Cir. 1998).

B.    Analysis of the Issue

Offill claims the trial court abused its discretion by refusing his multiple

conspiracies instruction.  J.A. 221A-221D.  However, the evidence clearly

demonstrated a single conspiracy between Offill and Stocker to commit

registration violations and to facilitate pump-and-dump operations.

As this Court has repeatedly reaffirmed, "[a] multiple conspiracy instruction

is not required unless the proof at trial demonstrates that [the defendant was]

involved *only* in 'separate conspiracies *unrelated* to the overall conspiracy charged

in the indictment.'"  *United States v. Kennedy*, 32 F.3d 876, 884 (4th Cir. 1994)

(quoting *United States v. Castaneda-Cantu*, 20 F.3d 1325, 1333 (5th Cir. 1994))

(first emphasis added); *see United States v. Squillacote*, 221 F.3d 542, 574 (4th Cir.

2000); *United States v. Stockton*, 349 F.3d 755, 762 (4th Cir. 2003).  This Court

distinguishes single from multiple conspiracies based on whether there is "one

overall agreement" or "one general business venture."  *United States v. Leavis*,

853 F.2d 215, 218 (4th Cir. 1988) (internal quotation marks and citations omitted).

This depends, in large measure, upon "the overlap of key actors, methods, and

goals."  *Id.*; *Stockton*, 349 F.3d at 762.  Put another way, this Court has found "[a]

single conspiracy exists, when the conspiracy had the same objective, it had the

same goal, the same nature, the same geographic spread, the same results, and the

same product." *United States v. Jeffers*, 570 F.3d 557, 567 (4th Cir. 2009) (quoting *United States v. Johnson*, 54 F.3d 1150, 1154 (4th Cir.1995)) (internal quotation marks omitted). Where the trial court refuses a multiple conspiracy instruction, error will be found "if the proof of multiple conspiracies was likely to have confused the jury into imputing guilt to [the defendant] as a member of one conspiracy because of the illegal activity of members of the other conspiracy." *Jeffers*, 570 F.3d at 567 (quoting *United States v. Roberts*, 262 F.3d 286, 294 (4th Cir.2001)).

Here, as the district court properly found, the evidence elicited at trial did not support a finding of multiple conspiracies. J.A. 2036. Rather, the evidence overwhelmingly established, as the jury found, that Offill conspired with Stocker to evade registration requirements as to the nine Issuers and to manipulate the stock of three of them (Emerging Holdings, MassClick, and China Score). Although the artificial manipulation of the Issuers' stock prices was carried out by three separate groups of promoters, Offill and Stocker were involved together with each of the Issuers. J.A. 20-49, 480-82, 533-35, 601-02, 620-21, 626-28, 631-32, 634-35, 638-39, 645-46. Thus, the evidence at trial did not support a showing that Offill was *only* involved in separate conspiracies *unrelated* to the conspiracy charged in the indictment. *See Kennedy*, 32 F.3d at 884. Here, there was "one

overall goal" or "general business venture" between Offill and Stocker to get free-trading stock issued to facilitate pump-and-dump deals. *See Leavis*, 853 F.2d at 218. Each of the unlawful transactions had a similar nature, methodology, and outcome. *See Jeffers*, 570 F.3d at 567.[18]

Offill claims that there were "at least eight separate conspiracies involving different co-conspirators at any given time." Def. Brief, 49. Offill misconstrues the evidence. He divides the Issuers into three separate conspiracies based on the activities of the promotion groups, ignoring the evidence of Offill's and Stocker's involvement together with each Issuer. In doing so, he conspicuously omits himself from the conspiracy analysis, instead focusing on Stocker's role as the sole connection between the separate groups. Contrary to his suggestion, this case is not like *Kotteakos v. United States*, 328 U.S. 750, 752 (1946) (conviction for single conspiracy improper where government admitted that there were eight or more different conspiracies executed through *one* common actor) or *United States v. Dennis*, 917 F.2d 1031, 1032 (7th Cir. 1990) (multiple conspiracies where multiple participants dealing drugs with *one* common participant). Instead, this case is more akin to *United States v. Hadeed*, 2010 WL 1734972 *1, *1-*3, *6 (4th

---

[18] Whether the goal is framed as conspiring to obtain money through fees and sales of securities or simply getting the shares issued to facilitate pump-and-dump operations does not change the analysis or conclusion.

Cir. 2010) (unpub.) (single conspiracy where attorney and shop owner together submitted false immigration forms for five separate workers; distinguishing *Kotteakos* because two individuals at core of conspiracy).

Offill identifies five other "conspiracies." Four of these so-called conspiracies were identified by government witnesses during the background portions of their testimony where they admitted their past criminal activity. These witnesses did not implicate Offill during this limited testimony or suggest that these crimes had anything to do with the Issuers in the indictment.[19] Thus, there was no risk of jury confusion leading to imputation of guilt to Offill. The fifth of these "conspiracies" was Clearvision, which was the subject of the government's Rule 404(b) evidence. As the court carefully instructed the jury on the limited use of this evidence (and the jury is presumed to follow these instructions), there was also no risk the jury would have been confused by this evidence. J.A. 1407-08, 1551-52, 2327-30.

---

[19] The four "conspiracies" identified by Offill include (1) Stocker's testimony that he did fifteen transactions with Michael Paloma, J.A. 412-15; (2) eDollars involving Stocker, Neu, and Luscko, J.A. 467, 897-883, 978, 1156; (3) TKO Holdings and Core Equity Holdings transactions also involving Luscko and Neu, J.A. 877-78, 1326; and (4) National Storm Management, Deep Rock Oil and Gas, and Global Beverage Solutions transactions, to which Lindberg pleaded guilty, J.A. 777-78. *See* Def. Brief, 49.

Offill's argument that the district court incorrectly instructed the jury that it could find him guilty of conspiracy based on the sole object of registration evasion without finding that he conspired to commit the pump and dump fails on a number of grounds. J.A. 2322-23; Def. Brief, 51. First, the jury made a specific finding on a special verdict form that Offill conspired to commit each of the three objects of the conspiracy—registration violations, securities fraud, and wire fraud—thus, relegating his argument to a counterfactual hypothetical. *See* J.A. 11 (docket # 111). Second, the district court's instruction was a correct statement of the law. *See United States v. Bolden*, 325 F.3d 471, 492 (4th Cir. 2003) ("[c]ourts have uniformly upheld multiple-object conspiracies, and they have consistently concluded that a guilty verdict must be sustained if the evidence shows that the conspiracy furthered any one of the objects alleged"); *United States v. Woodard*, 459 F.3d 1078, 1084 (11th Cir. 2006) (guilty verdict will be upheld if evidence is sufficient to support any of the alleged objects). And, third, as the purpose of the registration scheme was to create free-trading stock to be used in the pump and dump, this object clearly related to the overall purpose of the scheme. Thus, the jury could have found Offill guilty solely of conspiring to commit the registration scheme. *See United States v. Bollin*, 264 F.3d 391, 405 (4th Cir. 2001) (court found a single conspiracy with multiple objects of securities fraud, wire fraud, and

obstruction where each object furthered the overall goal of facilitating a fraudulent

debentures trading program).

Even if error, however, it was harmless. The evidence overwhelmingly

established that Offill and Stocker conspired together on each of the charged

transactions. The government did not argue in closing that Offill should be

convicted on the basis of actions taken by other co-conspirators in unrelated

conspiracies. And the court amply instructed the jury on the limited use of the

Rule 404(b) evidence.

## IV. THE SENTENCE IMPOSED BY THE DISTRICT COURT WAS REASONABLE

A.     <u>Procedural Background</u>

On March 7, 2010, the district court sentenced Offill to 60 months'

imprisonment on the conspiracy count and 96 months' imprisonment on each wire

fraud count, with all sentences to run concurrently. J.A. 2551, 2557-58. In

imposing this sentence, the district court varied downward from a guidelines range

of 168 to 210 months' incarceration in order to avoid any unwarranted sentencing

disparity between Offill and his co-conspirators. J.A. 2554, 2550-51, 2786. The

court determined the guidelines range by attributing to Offill more than $1 million

in gain earned by both him and Stocker, as well as applying a number of

enhancements.  J.A. 2541-43.  The court highlighted the need to specifically deter Offill, especially in light of his testimony at trial.  J.A. 2551.  That testimony, the district court stated, was "an affront to justice" and "one of the biggest pack of lies that I think I have ever heard from any defendant testifying in all my years of trial litigation."  J.A. 2550.

B.    <u>Standard of Review</u>

Appellate review of federal sentences is only for "unreasonableness." *United States v. Booker*, 543 U.S. 220, 260-63 (2005).  That review begins with whether the applicable advisory guidelines range was properly determined. *United States v. Diaz-Ibarra*, 522 F.3d 343, 347 (4th Cir. 2008).  This Court reviews legal conclusions *de novo* and factual findings, including loss amount and role, for clear error.  *United States v. Thornton*, 554 F.3d 443, 445 (4th Cir. 2009); *United States v. Loayza*, 107 F.3d 257, 265 (4th Cir.1997); *United States v. Reavis*, 48 F.3d 763, 770 (4th Cir. 1995).

C.    <u>Analysis of the Issue</u>

I.    <u>The District Court Did Not Clearly Err by Including David Stocker's Gain When Determining Offill's Offense Level</u>

Offill argues that the district court erred by including Stocker's gain in his loss calculation.  First, he argues that neither U.S.S.G. § 2B1.1 nor the

commentary permits a sentencing court to look beyond the gain of a particular defendant. Def. Brief, 54-5. This appears to be an issue of first impression.[20] Application note 3(B) to U.S.S.G. § 2B1.1 states that a court "shall use the gain that resulted *from the offense* as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." (Emphasis added.) By its very terms, the application note permits use of the gain *from the offense*, not just from a defendant's particular role in the offense. Nothing in the application note itself suggests, when calculating gain, a court should ignore other guidelines provisions, such as that for relevant conduct under U.S.S.G. § 1B1.3.

Second, Offill claims that the district court failed to make particularized findings about the scope of his agreement when calculating the amount of gain attributable to him. Def. Brief, 55-6. As the court was well aware, the evidence at trial was replete with examples of Offill's close association with Stocker and his stock trading, including that Offill acted as the initial accredited investor for the shares transferred to and sold by Stocker and that Offill knew of Stocker's trading

---

[20] Offill cites to *United States v. McMillan*, 600 F.3d 434 (11th Cir. 2010), in support of his position. *McMillan* does not address the specific claim here. Rather, the Eleventh Circuit merely found that the district court did not clearly err by using defendants' individual salaries to determine their gain instead of trying to calculate loss in the failure of a health maintenance organization that went into liquidation. *Id.* at 458.

activity.  J.A. 452-53, 520, 614.  The government's sentencing brief also set out the full scope of Offill's role in the scheme, including his role in causing the issuance of the stock used in the conspiracy for the illegal trading, his close association with Stocker, and his role in obstructing the SEC during its investigations of the illegal trading.  J.A. 2501-3.  The government's brief, as well as the PSR, also described the amount of Stocker's gain attributable to Offill.  J.A. 2505, 2770-77.  At the sentencing hearing, the government also addressed the specific contentions raised in Offill's sentencing memoranda, and argued that, even accepting some of his claims, Stocker's gain was still over $1 million.  J.A. 2542.  Although the court did not make individualized findings with regard to the scope of Offill's agreement, it clearly adopted the government's position on the scope of Offill's involvement in the conspiracy when it stated that "[t]he loss amount, *as the Government stated*, is in excess of $1 million based on the facts and the testimony that I heard in the case."  J.A. 2543 (emphasis added). Moreover, any error was harmless in that the evidence overwhelmingly established that Stocker's gain was foreseeable to Offill.

Lastly, Offill's argument that Stocker's gain was not attributable to him because Offill did not participate in the pump-and-dump aspects of the conspiracy is not only factually inaccurate, as he participated in the Emerging Holdings and

59

MassClick trading, but the jury specifically found he conspired to commit securities fraud. J.A. 11 (docket # 111), 804-10, 1650-56.

      ii.     <u>The District Court Did Not Clearly Err by Denying Offill's Request for a Role Reduction</u>

The district court did not clearly err in finding Offill did not meet his burden in establishing that he deserved a minimal or minor role adjustment. In order to receive a reduction as a minor or minimal participant under U.S.S.G. § 3B1.2, a defendant must show that he was "substantially less culpable than the average participant." *Id.*, Application Note 3(A). In determining whether the adjustment applies, this Court not only examines the defendant's conduct "relative to the other defendants, but also . . . relative to the elements of conviction." *United States v. Blake*, 571 F.3d 331, 352-53 (4th Cir. 2009) (quoting *United States v. Akinkoye*, 185 F.3d 192, 202 (4th Cir. 1999)), *cert. denied*, 130 S. Ct. 1104 (2010). In doing so, the Court looks to whether the defendant's conduct was "material or essential to committing the offense." *Id.*

Here, Offill's conduct was clearly "material" and "essential" to the success of the conspiracy as he played a central role in the stock issuances, drafted legal documents to fool regulators, and participated in trading with two of the nine Issuers. Though he played a different role than other co-conspirators and had no

involvement in the illegal marketing of the shares, his role was nonetheless

essential to the success of the conspiracy. Thus, he was not entitled to a minor or

minimal role adjustment, and the district court did not clearly err in so finding.

*See Akinkoye*, 185 F.3d at 201-02.

### iii.     Offill's Sentence Is Not Disproportionate

Offill argued, variously, for a sentence of 12 to 36 months, 36 to 120

months, and 66 months. J.A. 2444, 2547. He claims his 96-month sentence was

disproportionate, despite the district court having varied 72 months below the

bottom of the advisory guidelines range. J.A. 2544, 2551. His co-defendants

received sentences ranging from 3 to 120 months. J.A. 2510-11. Offill does not

challenge the sentencing court's application of the factors in 18 U.S.C. § 3553;

rather, he claims the court should have varied further.

A "sentence within the proper advisory Guidelines range is presumptively

reasonable." *United States v. Johnson*, 445 F.3d 339, 341 (4th Cir. 2006). Where

a court departs below the advisory guidelines range, a defendant's reasonableness

challenge is even more difficult to credit. *See United States v. Curry*, 536 F.3d

571, 573 (6th Cir. 2008).

Offill's sentence was reasonable. The jury convicted him for his role in the

registration and pump-and-dump components of the conspiracy. And, unlike his

co-defendants, Offill did not plead guilty, accept responsibility, or cooperate.  J.A.

2510-11.  Instead, as a former fifteen-year SEC enforcement attorney, he went to

trial, denied his guilt, and lied repeatedly on the stand.  J.A. 2550-51.  These facts

justify any difference between his sentence and those lesser sentences imposed on

co-conspirators.  *See, e.g., United States v. Quinn*, 359 F.3d 666, 682 (4th Cir.

2004) (approving significant prison term for defendants who went to trial in spite

of much lower stipulated loss and only six months home confinement for

defendant who pled guilty); *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir.

2006) (rejecting defendant's argument of unwarranted disparity in relation to

more-culpable defendant who cooperated with the government; "a sentencing

difference is not a forbidden 'disparity' if it is justified by legitimate

considerations, such as rewards for cooperation").  The district court correctly

noted these differences when fashioning its sentence.  J.A. 2550-51.  And, despite

them, it chose nonetheless to vary well below the advisory guidelines range.  Offill

has offered no basis for a finding that his sentence is unreasonable.

## CONCLUSION

For the reasons stated, this Court should affirm the defendant's convictions and sentence.

Respectfully submitted,

Neil H. MacBride
United States Attorney


/s/ David B. Goodhand
David B. Goodhand
Assistant United States Attorney


Denis J. McInerney
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

/s/ Patrick F. Stokes
Patrick F. Stokes
Attorney

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

The United States respectfully suggests that oral argument is not necessary in this case. The legal issues are not novel but rather well-settled, and oral argument likely would not aid the Court in reaching its decision.

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I hereby certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief does not exceed 14,000 words (specifically 13,950), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect 9 in 14-point Times New Roman typeface.

/s/ David B. Goodhand
David B. Goodhand
Assistant United States Attorney

# CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of January, 2011, the foregoing Brief of

the United States was electronically filed with the Clerk of Court  using the

CM/ECF system, which will send notice of such filing to the following registered

CM/ECF user:

George Kostolampros                    Kevin R. Brehm
Ronald M. Jacobs                       Assistant Federal Public Defender
Stephen H. Swart                       1650 King Street, Suite 500
*Pro bono counsel*                     Alexandria, VA 22314
Venable LLP
575 7th Street, NW
Washington, DC 20004


                                       /s/ David B. Goodhand
                                       David B. Goodhand
                                       Assistant United States Attorney